## UNITED STATES DISTRICT COURT OF
## NEW HAMPSHIRE

| | |
|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS GUTIERREZ, RICHARD J. GAYNOR, KENWARDEV RAJA SINGH BAL, DANIEL W. SQUILLER, J. MICHAEL CONAWAY, KATHLEEN A. COTE, ERNEST L. GODSHALK, MATTHEW E. MASSENGILL, MARY PETROVICH, ROBERT E. SWITZ, NOEL G. WATSON, THOMAS WROE, JR., MORGAN STANLEY & CO., LLC, GOLDMAN SACHS & CO., and CANACCORD GENUITY INC.,<br><br>Defendants. | CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Docket No._____<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Norfolk County Retirement System ("Plaintiff" or "Retirement System"), individually and on behalf of all other persons similarly situated, for its Class Action Complaint against Defendants, alleges the following based on personal knowledge as to itself and its own acts, and information and belief as to all other matters based upon, *inter alia*, the investigation of Counsel, which included review and analysis of regulatory filings made by GT Advanced Technologies, Inc. ("GTAT" or "Company") with the Securities and Exchange Commission ("SEC"); Company press releases; transcripts of investor calls; the Company's bankruptcy filings; industry analysts' reports about the Company; and public information about the Company.

## SUMMARY OF THE ALLEGATIONS

1.      This is a securities class action brought on behalf of all persons or entities that: (i) purchased the common stock of GTAT between November 5, 2013 and 9:40 a.m. Eastern Standard Time on October 6, 2014, when trading in GTAT common stock was suspended (the "Class Period"); and (ii) purchased GTAT common stock in or traceable to the Company's public offering of 9,942,196 shares at $8.65 per share beginning on December 4, 2013, which included 1,292,196 shares sold pursuant to an overallotment option granted by GTAT to certain underwriters (the "Equity Offering"), and were damaged thereby.

2.      The claims asserted herein are alleged against certain of the Company's executive officers and GTAT's Board of Directors ("Board"), including the directors who signed the Registration Statement for the Equity Offering, and the underwriters of the Equity Offering (collectively, "Defendants"), and arise, under Sections 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

3.      In 2010, GTAT, a public company trading on the NASDAQ, began to reorient its operations from primarily supplying materials and equipment for solar panels, cells and chips (*i.e.*, polysilicon business and photovoltaic business) to being both a provider of sapphire crystal growth equipment *and* provider of sapphire materials.  Synthetic sapphire is used to make screens on mobile devices tougher and scratch resistant.  Apple Inc. ("Apple"), the leading developer and manufacturer of smart phones and electronic devices, has used sapphire for the thumb-print identification screens and camera lenses of certain iPhone models.

4.      On November 4, 2013, after the market closed, GTAT announced a multiyear agreement to supply Apple with sapphire ("Supply Agreement").  Pursuant to the deal, the

Company secured $578 million in prepayment loans from Apple to pay for the equipment to manufacture large quantities of synthetic sapphire at a then-empty 1.4 million square foot facility in Mesa, Arizona, which GTAT leased from Apple.  The deal also provided Apple with an exclusive license for certain applications of GTAT's sapphire glass technology, yet Apple had no obligation to purchase any of GTAT's sapphire glass.  On the news of the agreement with Apple, the Company's stock jumped 21% to close at $10.10 on November 5, 2013.

5.      One month later, on December 4, 2013, the Company conducted a debt and the Equity Offering in which it raised $300 million -- $214 in convertible notes and $86 million in common stock. The underwriters for these offerings were Morgan Stanley, Goldman Sachs and Canaccord Genuity.

6.      In the Registration Statement filed with the SEC on December 3, 2013 and two separate Prospectus Supplements filed with the SEC on December 5, 2013 (collectively "Offering Materials") for the Equity Offering, GTAT represented that its "sapphire material operations will constitute a larger portion of our business going forward than in the past as a result of our supply arrangement with Apple."  The Offering Materials also only referenced certain limited risks associated with the Apple deal, primarily related to the transitioning of most of its business operations in order to provide large quantities of sapphire material to Apple and Apple's stringent quality guidelines.

7.      These statements, and similar statements issued through the Class Period, were materially false and misleading.  The truth, as confirmed by the Company's bankruptcy filings, is that after the Company entered into the Supply Agreement it had an imminent "liquidity crisis" and the Defendants knew that the Company would not be able to satisfy the production and liquidity requirements of the Supply Agreement.

8.      The risk identified in the Offering Materials and subsequent periodic filings with the SEC were also false and misleading because those risks had already materialized at the time the statements were made.

9.      On August 5, 2014, for the first time, GTAT's President and CEO Tom Gutierrez indicated that the build out of the Arizona facility was challenging, $524 million was spent on related capital expenditures, there were unexpected costly production inefficiencies, and that the facility would not be at full production level until January of 2015.  These statements were belated and purposefully concealed the true nature of the problems to reassure investors that the endeavor was moving forward.  In response, GTAT's stock price climbed in August 2014 from $14.13 to a high of $18.57 per share.

10.     On September 9, 2014, Apple announced that its new iPhone6 did not feature screens made with GTAT's sapphire glass displays.  Investors and analysts were surprised by this, and GTAT's stock traded down on record high volume of 37.7 million shares.  Over the course of two trading days, GTAT stock dropped from $17.15 per share to $12.78, representing a 25% decline.  Following Apple's news, the Company did not issue any statement concerning its relationship with Apple.

11.     Then, less than one month later, on October 6, 2014, GTAT filed for Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Code for the District of New Hampshire, *In re: GT Advanced Technologies Inc., et al.*, Case No. 14-11916-HJB ("GTAT Bankruptcy").  GTAT stated it has a "severe liquidity crisis" but did not specify the cause for the "crisis."  At the time of the bankruptcy filing, GTAT stated it had only $85 million of cash as of September 29, 2014, and listed approximately $1.3 billion in liabilities as of June 28, 2014.  The Company's Chief Executive Officer, Defendant Thomas Gutierrez said, "today's filing does not

mean we are going out of business; rather, it provides us with the opportunity to continue to execute our business plan on a stronger footing, maintain operations of our diversified business, and improve our balance sheet."  Despite Gutierrez's optimism, investors fled – the price of GTAT declined 93% to close at $0.80 per share, on extremely heavy trading volume.  The Company lost $1.4 billion in market capitalization on that day.

12.     GTAT's subsequent bankruptcy filings, specifically a sworn declaration by GTAT's Chief Operation Officer, Defendant Daniel W. Squiller, confirm that the true cause of GTAT's liquidity crises was that from the time GTAT entered into the Supply Agreement with Apple at the beginning of the Class Period, Defendants knew that GTAT was unable to satisfy the production and liquidity requirements of the Supply Agreement, thereby jeopardizing the Company's well-being.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     Defendants named herein have sufficient minimum contacts with this District, the State of New Hampshire, and the United States so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and Section 22 of the Securities Act [15 U.S.C. § 77v] or Section 27 of the Exchange Act [15 U.S.C. § 78aa].  GTAT's principal place of business is in this District and many of the acts and practices complained of herein, including the dissemination to the public of the misleading and untrue statements of material facts, occurred in this District.

H0040715.2

16.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate wire and telephone communications, and the facilities of the national securities markets.

## PARTIES

### A.     Plaintiff

17.     Plaintiff,  Norfolk County Retirement System was established in 1911 and is governed under the Massachusetts General Laws, Chapter 32.  The Retirement System serves approximately 10,000 active and retired employees of the County, 19 towns and 21 authorities and special district. The Retirement System purchased GTAT common stock on the NASDAQ stock market ("NASDAQ") in the Equity Offering and during the Class Period on the open market, as described in the attached Certification, and was damaged thereby.

### B.     Officer Defendants

18.     Defendant Thomas Gutierrez ("Gutierrez") is, and was at all relevant times, GTAT's President, Chief Executive Officer, and Director.

19.     Defendant Richard J. Gaynor ("Gaynor") was, at all relevant times, Vice President and Chief Financial Officer of the Company until his resignation on March 11, 2014.

20.     Defendant Kenwardev Raja Singh Bal ("Bal") was appointed Chief Financial Officer of the Company effective March 7, 2014.

21.     Defendant Daniel W. Squiller ("Squiller") is and was, at all relevant times, Chief Operating Officer of the Company.

22.     Defendants Gutierrez, Gaynor, Bal and Squiller are collectively referred to hereinafter as the "Officer Defendants." The Officer Defendants, because of their positions with GTAT, possessed the power and authority to control the contents of GTAT's reports to the SEC, press releases, and presentations to securities analysts.   Each of the Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations  and omissions which were being made were, at the time made, materially false and/or misleading.

   C.     **Director Defendants**

23.     Defendant J. Michal Conaway ("Conaway") is, and was at all relevant times, a Director of GTAT. Defendant Conaway signed the Offering Materials for the Equity Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Equity Offering.

24.     Defendant Kathleen A. Cote ("Cote") is, and was at all relevant times, a Director of GTAT. Defendant Cote signed the Offering Materials for the Equity Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Equity Offering.

25.     Defendant Ernest L. Godshalk ("Godshalk") is, and was at all relevant times, a Director of GTAT. Defendant Godshalk signed the Offering Materials for the Equity Offering

and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Registration Statement for the Equity Offering.

26.     Defendant Matthew E. Massengill ("Massengill") is, and was at all relevant times, a Director of GTAT as well as the Company's Chairman of the Board. Defendant Massengill signed the Registration Statement for the Equity Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Registration Statement for the Equity Offering.

27.     Defendant Mary Petrovich ("Petrovich") was, at all relevant times, a Director of GTAT until her resignation from the Board on January 7, 2014. Defendant Petrovich signed the Registration Statement for the Equity Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Registration Statement for the Equity Offering.

28.     Defendant Robert E. Switz ("Switz") is, and was at all relevant times, a Director of GTAT. Defendant Switz signed the Registration Statement for the Equity Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Registration Statement for the Equity Offering.

29.     Defendant Noel G. Watson ("Watson") is, and was at all relevant times, a Director of GTAT. Defendant Watson signed the Registration Statement for the Equity Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Registration Statement for the Equity Offering.

30.     Defendant Thomas Wroe, Jr. ("Wroe") is, and was at all relevant times, a Director of GTAT. Defendant Wroe signed the Registration Statement for the Equity Offering

and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Registration Statement for the Equity Offering.

31.　　Defendants Conaway, Cote, Godshalk, Massengill, Petrovich, Switz, Watson, and Wroe are collectively referred to herein as the "Director Defendants."

### D.　　Underwriter Defendants

32.　　Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), Goldman, Sachs & Co. ("Goldman Sachs") and Canaccord Genuity Inc. ("Canaccord Genuity") acted as underwriters of the Equity Offering and signed the Registration Statement. In the Equity Offering Morgan Stanley, Goldman Sachs and Canaccord Genuity (collectively "Underwriter Defendants") organized the distribution of at least 9,942,196 shares of the Company common stock to investors which included an option granted by the Company to the Underwriter Defendants to purchase 1,292,196 shares of Common Stock. The Underwriter Defendants received $4.4 million in underwriting commissions and expenses for the Equity Offering.

33.　　The $4.4 million in combined fees were paid in part to compensate the Underwriter Defendants for conducting a reasonable due diligence investigation into GTAT in connection with the Equity Offering to ensure that statements contained in or incorporated by reference into the Registration Statement were truthful and accurate. The Underwriter Defendants' due diligence investigation was a critical component of the Equity Offering intended to provide investors with important safeguards and protections.

## RELEVANT NON-PARTY

34.　　Non-party GTAT is a Delaware Corporation headquartered at 243 Daniel Webster Highway Merrimack, New Hampshire. The Company produces materials and equipment for the solar, light emitting diode, and electronics industries, including synthetic

H0040715.2

9

sapphire which is the subject of the Apple Contract.  As of October 6, 2014, GTAT filed for protection under Chapter 11 of the United States Bankruptcy Code and is therefore not a named defendant.  At all relevant times, the Company's common stock traded on NASDAQ, which is an efficient market, under ticker symbol "GTAT."

## BACKGROUND

35.    After months of intensive negotiations, GTAT entered into the Supply Agreement with Apple on October 30, 2013.  The deal was structured such that GTAT was required to acquire 2,036 sapphire furnaces using a prepayment, *i.e.*, loan, from Apple of up to $568 million that was to be disbursed to GTAT in four $139 million installments beginning with the first in November 2013 and the last in April 2014.  The prepayment, however, was calculated based on the cost to GTAT of the furnaces and related equipment used to produce sapphire material.  Consequently, this structure enabled Apple to purchase sapphire material from GTAT *at below market value* such that GTAT would only earn an income from the arrangement if Apple opted to buy sapphire material in excess of the loan repayment obligations.

36.    The Supply Agreement contained other terms that transferred the risk of this new relationship almost exclusively onto GTAT.  For example,

> (a)    Apple requires GTAT to commit to supply millions of units of sapphire material, but Apple has *no obligation to buy* any of that sapphire;
>
> (b)    Apple has no obligation to buy boules exclusively from GTAT.
>
> (c)    GTAT is to accept and fulfill any purchase order placed by Apple on the date selected by Apple.  If there is any delay, GTAT must either use expedited shipping (at its own cost) or purchase substitute goods (at its

own cost).  If GTAT's delivery is late, GTAT must pay $320,000 per boule of sapphire as liquidated damages to Apple.  This is a severe penalty since a boule cost less than $20,000.  Conversely, Apple has the right, without compensating GTAT, to cancel a purchase order in whole or in part at any time and reschedule a delivery date at any time;

(d)     GTAT is required to repay the $578 million prepayments over a five-year period beginning in 2015 but GTAT's repayment schedule can be accelerated under certain circumstances, including if GTAT fails to meet certain financial metrics or fails to meet certain specified technical and performance requirements; and

(e)     Apple took a lien on all of GTAT's assets including the 2,036 sapphire furnaces and related equipment that GTAT was acquiring in connection with the Supply Agreement as collateral to secure GTAT's repayment of the $578 million advance.

37.     Despite these draconian terms, GTAT was blinded by the prestige and growth potential of being an Apple-supplier and took on substantial new debt to execute the Supply Agreement.

38.     On November 4, 2013, GTAT announced the Supply Agreement.  On this news, GTAT's stock price began a steady upward climb during the remainder of 2013 and first nine months of 2014.

39.     Prior to the announcement of the Supply Agreement, GTAT and Apple had already begun to "build out" the 1.4 million square foot Mesa, Arizona facility to house the

furnaces and related equipment to manufacture the synthetic sapphire.  GTAT also began training more than 1,000 employees in the highly-specialized manufacturing process.

40.     The first phase of the Arizona Facility was not operational until December 2013, which gave GTAT only six months to ramp up to full operational capacity so that it could meet its "Minimum Supply Commitment" as defined in the Supply Agreement.

41.     On December 4, 2013, GTAT conducted a $214 million debt offering and also the Equity Offering which raised $86 million.  The Company stated that it would use the capital for general operating costs.

42.     Throughout 2014, the Company provided positive updates on the progress at the Arizona Facility.

## THE TRUTH EMERGES

43.     On September 9, 2014, Apple announced that its new iPhone6 did not feature screens made with GTAT's sapphire glass displays.  Investors and analysts were surprised by this, and GTAT's stock traded down on record high volume of 37.7 million shares.  Over the course of two trading days, GTAT stock dropped from $17.15 per share to $12.78, representing a 25% decline and a loss of approximately $1.4 billion in market capitalization.

44.     On October 6, 2014, GTAT shocked the market by announcing that it had filed for bankruptcy under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Hampshire.  The Company indicated that GTAT had just $85 million of cash as of September 29, 2014, and listed approximately $1.5 billion in assets and approximately $1.3 billion in liabilities as of June 28, 2014.  On this news, the price of GTAT stock declined from $11.05 per share to $0.80 per share, or almost 93%, on heavy trading volume.

H0040715.2



45.      Over the next month, GTAT made several bankruptcy filings which confirm what the true state of affairs were at the Company during the Class Period, contrary to the Defendants' public statements.  Most enlightening is Defendant Squiller's declaration (filed on 10/28/2014, Dkt. No. 324 of the GTAT Bankruptcy) and supplemental declaration (filed on 11/7/2014, Dkt. No. 462 of the GTAT Bankruptcy).  He stated:  "GTAT's business relationship with Apple has become unsustainable without Apple taking responsibility for the cost overruns and additional expenses caused by Apple. . . . Apple embedded itself in the operations of GTAT at the Arizona Facility in a manner that forced GTAT to divert an inordinate amount of cash and corporate resources to its operations at the Arizona Facility, and affected GTAT's continued viability as a whole."

46.      Defendant Squiller provided detailed examples of the dysfunctional relationship between GTAT and Apple, and indicated that by the beginning of the Class Period GTAT had already ceded control of the Arizona Facility build out to Apple, and GTAT knew Apple's

decisions were going to prevent GTAT from adequately fulfilling the supply agreement and stabilizing its costs.  For example,

(a)   Apple selected the Arizona Facility and negotiated all power and construction contracts to design and build out the facility with third parties.

(b)   GTAT had no direct contact with the contractors.  GTAT advised Apple that back-up power supplies were essential since power interruptions would destroy whole production runs of sapphire boules and cause production delays.  Apple ignored this advice.  From late 2013 through October 2014, GTAT incurred $10 million in losses resulting from power outages.

(c)   Apple, not GTAT, selected the tools to use and the fabrication process to implement.  The majority of the Apple-selected tools did not meet performance and reliability standards and needed to be replaced.  These bad decisions caused significant delays and a 30% increase in fabrication costs that GTAT absorbed.

(d)   The first phase of the Arizona Facility was not operational until December 2013, which was only six months before GTAT was expected to be operating at full capacity in order to satisfy the supply agreement.  The parties originally anticipated that the facility would be ready much earlier in 2013.

H0040715.2

47.     GTAT never disclosed the foregoing, or that it disagreed with, much less was concerned by, the decisions Apple was making that had a direct impact on whether GTAT could fulfill the Supply Agreement and achieve its planned fabrication cost and production targets.  Therefore, GTAT concealed material information from investors, including that it had already failed to fulfill the terms of the Supply Agreement with Apple both from a liquidity and production standpoint.

48.     Additionally, at some point in early to mid-2014, GTAT became aware that Apple decided against using GTAT's sapphire on the new iPhone6.  GTAT withheld this highly material information from investors, hid behind the purported confidentiality clause of the supply agreement, and instead certain of GTAT's officers traded on this insider information for their own benefit.  Consequently, throughout 2014 GTAT's stock price trended upward due to the omitted and false information, and GTAT officers Defendants Gutierrez, Gaynor and Squiller took advantage of this by cashing out large blocks of their GTAT stock for $10.5 million, $2 million, and $3.6 million, respectively. Thus, when Apple revealed on September 9, 2014 that GTAT's sapphire was not used in the iPhone6 and then GTAT filed for bankruptcy, it was the public investors, like the Retirement System, who were harmed by the 25% stock drop.

## DEFENDANTS' FALSE AND MISLEADING MATERIAL
## STATEMENTS AND OMISSIONS

49.     *On November 4, 2013*, GTAT announced in a press release that it "expect[ed] [the Supply Agreement] to be cash positive and accretive to earnings starting in 2014," and that the Company's sapphire segment would comprise up to approximately 80% of GTAT's 2014  estimated $600 million to $800 million of total revenue. Defendant Gutierrez

further stated that "[b]y leveraging the new materials operation and our enhanced R&D efforts, we will be well  positioned to drive the growth of other sapphire opportunities."

50.     After the market closed on November 4, 2013, GTAT held its earnings conference call for the quarter.  On the call, Defendant Gutierrez described the Supply Agreement  as "a significant milestone in GT's diversification strategy, and it provides a path to add a recurring revenue stream to our otherwise cyclical equipment business model." Defendant Gutierrez also represented that "[w]e have confidence in the long-term value of this opportunity given the financial and technical resources that both parties are dedicating to the project," and that the Company was in a "good position" with regard to its capital and financing.

51.     On the same call, then-Chief Financial Officer, Defendant Gaynor, represented that GTAT ended the quarter with approximately $258 million of cash and cash equivalents, and that "we are confident that our projected cash levels are adequate to run the business for the foreseeable future." Defendant Gaynor also announced that the Company was lowering its 2013 revenue guidance from $500 million-$600 million to $290 million-$320 million indicating that the Company's furnace equipment, which they expected to ship to customers, will now likely be used  for making their own sapphire. According to Defendant Gutierrez, the Company expected 2015 revenues to exceed $1 billion, and expected revenues to nearly double from 2014 levels due in substantial part to the Apple Contract.

52.     The statements set forth above in ¶¶48-50 concealed material information and were materially false and misleading because Defendants were aware that, in light of the Supply Agreement terms, and the condition of the Arizona Facility,

the Supply Agreement would not yield results for GTAT as represented because: (a) production at the Arizona Facility was delayed and was GTAT was incurring costly overruns given Apple's inefficient construction and equipment decisions; (b) GTAT would not benefit from additional revenue in 2014 given the economic structure of the Supply Agreement; and (c) GTAT's 2014 guidance was impossible to meet given the restraints impacting GTAT under the Supply Agreement.

53.     _On December 2 and 5, 2013_, GTAT filed the Registration Statement for the Equity Offering and then days later filed the Prospectus Supplement in which Defendants stated that "[w]e expect that our sapphire material operations will constitute a larger portion of our business going forward than in the past as a result of our supply arrangement with Apple."

54.     Defendants also set forth in the Offering Materials risks pertaining to GTAT's ability to transition its business to manufacture unprecedented quantities of synthetic sapphire material for Apple and to adequately and timely satisfy the terms of the Supply Agreement.

55.     The Offering Materials concealed material information, and the statements set forth in ¶¶52-53 were materially false and misleading, because at the time that the statements were made the Arizona Facility was behind schedule and experiencing costly overruns. Thus, GTAT could not manufacture the quality and quantities of synthetic sapphire to realize an income from the Supply Agreement and the risks that Defendants had identified had already materialized.

56.     _On February 24, 2014_, GTAT held its earnings conference call for the fourth quarter of its 2013 fiscal year. During the call, Defendant Gutierrez stated that GTAT received the first two prepayments from Apple pursuant to the Supply Agreement and that, "[w]e're

very pleased to have Apple as a sapphire customer, and to be in a position to leverage our proprietary know-how to enable the supply of this versatile material to them." Defendant Gaynor explained that the Company ended 2013 with approximately $593 million of cash and cash equivalents and restricted cash. Defendant Gaynor further stated that, "the combination of Apple prepayments received to date, and to be received in the future, will fully fund the capital outlay in Arizona." To this end, Defendant Gaynor stated that GTAT started the year with $593 million in cash, and has received $225 million under the Apple Contract with "another $350 million to come from that." Defendant Gaynor even stated that GTAT expected to spend "some $550 million in terms of investment into the Arizona facility . . . [and] that we expect to have some additional cash from operations being generated during the year."

57.     The statements set forth above in ¶ 55 were materially false and misleading because Defendants knew that the Arizona Facility was behind schedule and experiencing costly overruns and that Apple's payments to GTAT would be insufficient to fund the capital outlay for the Arizona Facility. Defendants also knew that there was a substantial risk that Apple would force the Company to repay monies received and/or would withhold future prepayments because of GTAT's failure to satisfy the production and liquidity requirements of the Supply Agreement.

58.     _On March 14, 2014_, GTAT held a new product and technology briefing. During the briefing, Defendant Gutierrez stated that "We talked about the Arizona project. We talked about the fact that it's going quite well. We've received our initial prepayments. We're adding staff and building out the facility. And we've deployed most of the $180 million

H0040715.2

18

of plant, property and equipment that we deployed in the fourth quarter, in the fourth quarter was deployed in Arizona."

59.    The statements set forth above in ¶ 57 were materially false and misleading because the "Arizona project" was not "going quite well." In fact, Defendants knew that the Arizona Facility was behind schedule, experiencing costly overruns and failing to efficiently satisfy the production requirements of the Supply Agreement. Further, Defendants failed to disclose that because of these problems, Apple delayed disbursement of the third payment.

60.    *On May 8, 2014*, Defendants held their earnings conference call for the first quarter of fiscal 2014. During the call, Defendant Gutierrez stated that "we expect our sapphire materials business to provide a solid stream of return revenues once the build out in Arizona is complete. . . . In addition, we have now received three of the four prepayments we expected from Apple. . . . This brings total cash received from April to date to approximately $440 million. I remain very enthusiastic about out Sapphires materials and equipment business. While we cannot be specific with respect to the production ramp in Arizona, we continue to expect our Sapphire business to contribute over 80% of our revenue this year." Defendant Gutierrez further stated on the conference call that "we are producing Sapphire [for Apple] and that I expect the Sapphire that we produce will be fully utilized."

61.    Defendant Bal, the Company's current Chief Financial Officer, stated that the Company ended the quarter with $509 million in cash, which accounted for GTAT's receipt of the second prepayment from Apple on January 23, 2014. According to Defendant Bal, GTAT received its third Apple prepayment of $103 million at the outset of the second quarter

and "[w]e expect the total prepayments [under the Apple Agreement] will fully fund[] our capital outlays related to the Arizona project." Defendant Bal further stated that "[w]e expect year-end cash, cash equivalents, and restricted cash of $400 million to $450 million, again reflecting the incremental CapEx discussed earlier."

62.    The statements set forth above in ¶¶59-60 concealed material information and were materially false and misleading because Defendants knew that the total prepayments were not sufficient to fully fund development of the Arizona Facility because of the production delays and inefficiencies that resulted in costly overruns and mounting expenses absorbed by GTAT.

63.    _On August 5, 2014_, Defendants held an earnings conference call to discuss results for the second quarter of fiscal 2014.  During the call, Defendant Gutierrez stated that "[t]he build-out of our Arizona facility, which has involved taking a $1.4 million square foot facility from a shell to a functional structure, and the installation of over 1 million square feet of Sapphire growth and fabrication equipment, is nearly complete.  And we are commencing the transition to volume production." Defendant Gutierrez also stated that "[t]he fourth prepayment from Apple is contingent upon the achievement of certain operational targets by [GTAT]. [GTAT] expects to hit these targets and receive the final $139 million prepayment by the end of October 2014.  We remain very positive about our Sapphire materials business."

64.    Defendant Bal also stated on the call that the Company ended the quarter with $333 million of cash, cash equivalents and restricted cash, as compared to $509 million in March. GTAT's $333 million in cash was boosted by the Company's receipt of the third

portion of Apple's down-payment in the amount of $103 million on April 4, 2014. Defendant Bal further stated that "[t]o date we have received a total of $439 million in prepayments. As Tom noted earlier, the fourth prepayment is contingent on achievement of certain operational targets by [GTAT].  We expect to  attain these targets and receive the final $139 million prepayment by the end of October."

65.     Defendant Gutierrez assured investors that "we don't expect to need to go out into the marketplace to raise additional capital" and that "we're expecting to end the year with approximately $400 million of cash on the balance sheet." Defendant Gutierrez continued, stating that "I feel very confident, based on the progress that we're making, that we will achieve the milestone in that timeframe. But as I indicated with a projection of having close to $400 million in the bank at the end of the year, it's not a world-ending event if it slides. Although, again, I don't anticipate that it will slide."

66.     GTAT also represented in its *Form 10-Q for the second quarter of fiscal 2014, filed August 7, 2014*, that "[t]he Company is currently in compliance, and based on the Company's operational plans and financial forecasts, the Company expects to maintain compliance with the operating metrics and financial covenants in the [Apple Contract] and management believes that the Company will have sufficient cash resources to fund operations for at least the next twelve months."

67.     The public statements and SEC filings concealed material information, and the statements set forth above in ¶¶62-66 were materially false and misleading, because Defendants knew that it was unable to satisfy the terms of the Supply Agreement which would foreclose it from receiving the final prepayment from Apple and that

it was experiencing a severe cash shortage given the extraordinary additional expenses incurred at the Arizona Facility.

68.    Even in disclosing "challenges" with the Arizona Facility build out, Defendants failed to disclose the full scope of problems plaguing production in the Arizona Facility and draining the Company's cash position.  Rather, Defendants made reassuring statements to the investing public regarding the Company's financial condition, progress at the Arizona Facility and satisfaction of the Supply Agreement.

## SCIENTER ALLEGATIONS

69.    The Retirement System alleges that Defendants intentionally and/or recklessly made the above material misrepresentations and omissions for the purposes of artificially inflating the price of and demand for GTAT common stock; raising capital in order to be able to fund its sapphire production requirements under the Supply Agreement; and avoiding material defaults under the terms of the Supply Agreement.

70.    As evidenced by Defendant Squiller's sworn statements, throughout the Class Period Defendants were aware of GTAT's deteriorating liquidity position, the Company's inability to efficiently and effectively produce large quantities of synthetic sapphire to satisfy the requirements of the Supply Agreement, and the Company's inability to ultimately continue as a going concern.

71.    Defendants intentionally inflated the stock price of GTAT common stock for the purpose of securing extraordinary amounts of proceeds from unusual and atypical insider sales. The  following charts reflect insider sales made by Defendants Gutierrez, Gaynor and Squiller (not including other  dispositions):

H0040715.2

| Sales by Thomas Gutierrez During the Class Period | | | |
|---|---|---|---|
| *Transaction Date* | *Shares Sold* | *Price* | *Proceeds* |
| 2/3/2014 | 100,000 | 10.1946 | 1,019,460.00 |
| 2/3/2014 | 50,000 | 10.1941 | 509,705.00 |
| 2/3/2014 | 50,000 | 10.1944 | 509,720.00 |
| 3/11/2014 | 3,916 | 17.2453 | 67,532.59 |
| 3/11/2014 | 32,712 | 17.2291 | 563,598.32 |
| 3/11/2014 | 53,384 | 17.2584 | 921,322.43 |
| 3/11/2014 | 53,613 | 17.2749 | 926,159.21 |
| 3/12/2014 | 75,000 | 16.6563 | 1,249,222.50 |
| 3/13/2014 | 15,000 | 17.1257 | 256,885.50 |
| 5/1/2014 | 67,730 | 17.1791 | 1,163,540.44 |
| 5/1/2014 | 50,000 | 17.048 | 852,400.00 |
| 6/3/2014 | 78,054 | 15.771 | 1,230,989.63 |
| 7/1/2014 | 50,000 | 19.111 | 955,550.00 |
| 7/1/2014 | 9,232 | 19.1149 | 176,468.76 |
| 9/8/2014 | 9,232 | 17.3796 | 160,448.47 |
| *TOTALS:* | *697,873* | | *10,563,002.85* |

| Sales by Richard Gaynor During the Class Period | | | |
|---|---|---|---|
| *Transaction Date* | *Shares Sold* | *Price* | *Proceeds* |
| 12/12/2013 | 46,250 | 7.95 | 367,687.50 |
| 12/12/2013 | 25,000 | 8.0357 | 200,892.50 |
| 12/12/2013 | 15,000 | 8.01 | 120,150.00 |
| 12/12/2013 | 2,750 | 8.0538 | 22,147.95 |
| 12/12/2013 | 3,500 | 8.04 | 28,140.00 |
| 2/3/2014 | 20,000 | 10.3094 | 206,188.00 |
| 2/3/2014 | 20,000 | 10.3101 | 206,202.00 |
| 2/3/2014 | 20,000 | 10.3418 | 206,836.00 |
| 2/3/2014 | 37,500 | 10.251 | 384,412.50 |
| 2/3/2014 | 18,750 | 10 | 187,500.00 |
| 2/3/2014 | 8,000 | 9.6378 | 77,102.40 |
| *TOTALS:* | *216,750* | | *2,007,258.85* |

| Sales by Daniel Squiller During the Class Period | | | |
|---|---|---|---|
| *Transaction Date* | *Shares Sold* | *Price* | *Proceeds* |
| 5/23/2014 | 76,190 | 15.88 | 1,209,897 |

| Sales by Daniel Squiller During the Class Period | | | |
|---|---|---|---|
| Transaction Date | Shares Sold | Price | Proceeds |
| 7/2/2014 | 95,400 | 19.77 | 1,886,058 |
| 7/3/2014 | 15,000 | 20.03-08 | 301,000 |
| 8/1/2014 | 600 | 14 | 8,400 |
| 8/4/2014 | 4,400 | 14 | 61,600 |
| 8/19/2014 | 10,000 | 18.39 | 183,900 |
| 9/2/2014 | 15,000 | 18 | 270,000 |
| TOTALS: | 216,590 | | 3,619,855.20 |

72.     As indicated above, Defendants Gutierrez, Gaynor and Squiller absconded with over $16 million from insider sales during the Class Period. These sales were unusual in both timing and amount and, as such, are highly indicative of scienter.

73.     These Defendants, Gutierrez, Gaynor and Squiller were also paid out performance-based bonuses at the end of 2013, precisely at the time that these Defendants knew that production at the Arizona Facility was failing – both from an efficiency and quality standpoint and that the Company's costs were escalating.

74.     In addition to Defendants Gutierrez's and Gaynor's insider sales, other non-party GTAT insiders also profited from Defendants' fraudulent scheme. Specifically, Ernest Godshalk (director) sold over $2.7 million during the Class Period, Thomas Wroe (director) sold over $260,000, Jeffrey Ford (Vice President of DSS Sales / China Support) sold over $4.1 million, Hoil Kim (Vice President, Chief Administrative Officer, General Counsel, and Secretary) over $3.6 million, and David Keck (Executive Vice President, Worldwide Sales and Services) sold over $3.8 million.

### RULE 23 CLASS ALLEGATIONS

75.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise

acquired: (1) the publicly traded common stock of GTAT during the Class Period; and (2) common stock in or traceable to the Equity Offering (the "Class") . Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period GTAT was actively traded on the NASDAQ. As of June 28, 2014, there were approximately 138 million shares of GTAT stock outstanding, owned by hundreds or thousands of investors.

77.     The Retirement System's claims are typical of the claims of the members of the Class as all members are similarly affected by Defendants' conduct in violation of federal law that is complained of herein.

78.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Classes are:

   (a)   Whether Defendants violated the Securities Act;

   (b)   Whether Defendants violated the Exchange Act;

   (c)   Whether Defendants omitted and/or misrepresented material facts;

   (d)   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

   (e)   Whether Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(f)     Whether the price of GTAT common stock was artificially inflated;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

79.     The Retirement System will fairly and adequately protect the interests of the Class, and the Retirement System has retained  counsel experienced in class action securities litigation.

80.     The Retirement System has no interests which conflict with those of the Class.

81.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

82.     Joinder of all Class members is impracticable.

### PRESUMPTION OF RELIANCE

83.     At all relevant times, the market for GTAT's securities was an efficient market for the following reasons, among others:

(i)     GTAT stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(j)     As a regulated issuer, GTAT filed periodic public reports with the SEC and NASDAQ;

(k)     GTAT regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures,

such as communications with the financial press and other similar
reporting services;  and

(l)     GTAT was followed by securities analysts employed by major brokerage
firm(s) who wrote reports which were distributed to the sales force and
certain customers of their respective brokerage firm(s). Each of these
reports was publicly available and entered the public marketplace.

84.     As a result of the foregoing, the market for GTAT common stock promptly
digested current information regarding GTAT from all publicly available sources and
reflected such information in the price of GTAT common stock. Under these circumstances,
all purchasers of GTAT common stock during the Class Period suffered similar injury
through their purchase of GTAT common stock at artificially inflated prices and the
presumption of reliance applies.

85.     A presumption of reliance is also appropriate in this action under the
Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128
(1972), because the Class' claims are grounded on Defendants' material omissions. Defendants
failed to disclose material adverse information regarding GTAT's operations and financial
performance. Specifically, GTAT failed to disclose the true status of its progress and operations
under the Supply Agreement. Because the facts withheld were material to investors, the
Retirement System is entitled to a presumption of reliance.

**LOSS CAUSATION**

86.     During the Class Period, as detailed herein, Defendants intentionally or
recklessly made materially false and misleading statements and omissions to artificially inflate
the price of GTAT common stock, which operated as a fraud or deceit on the Class. When

Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on October 6, 2014, the price of GTAT securities fell 93%, causing the Company to lose approximately $1.4 million in market capital.

87.     As a result of their purchases of GTAT securities during the Class Period, the Retirement System and other members of the Class suffered economic loss.

## NO SAFE-HARBOR

88.     The Private Securities Litigation Reform Act's statutory "safe harbor" is not applicable in this action. Defendant are liable for false and/or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of GTAT who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## COUNT I
### (For Violation of Section 11 of the Securities Act Against All Defendants Except Bal[1])

89.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

90.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired GTAT

---

[1] Defendant Bal became the CFO of the Company in March 2014, months after the Equity Offering.

common stock sold pursuant or traceable to the Equity Offering, and who were damaged thereby.

91.     This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

92.     Liability under this Count is predicated on the Officer Defendants (except for Bal) and the Director Defendants signing of the Registration Statement for the Equity Offering and all Defendants' (except for Bal) respective participation in the Equity Offering, which was conducted pursuant to the Offering Materials. The Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

93.     Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

94.     By reason of the foregoing, pursuant to Section 11(e) of the Securities Act, the Defendants named in this Count are each jointly and severally liable for violations of Section 11 to Plaintiff and the other members of the Class.

<u>COUNT II</u>
**(For Violation of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants)**

95.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

96.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired GTAT common stock in and/or traceable to the Equity Offering and who were damaged thereby.

97.     This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

98.     The Underwriter Defendants were statutory sellers of GTAT securities that were registered in the Equity Offering pursuant to the Registration Statement and sold by means of the Offering Materials. By means of the Offering Materials, the Underwriter Defendants sold approximately 10 million shares of stock through the Equity Offering to members of the Class. The Underwriter Defendants were at all relevant times motivated by their own financial interests. In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities that were sold in the Offerings by means of the materially false and misleading Offering Materials.

99.     The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

100.     Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

101.     By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class who purchased securities in or traceable to the Equity Offering, and who were damaged thereby.

<u>**COUNT III**</u>
**(For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against the Officer Defendants)**

102.     Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

103.     During the Class Period, the Officer Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase GTAT securities at artificially inflated prices.

104.     The Officer Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for GTAT securities in violation of Section 10(b) of the  Exchange Act and Rule 10b-5 promulgated thereunder.

105.     The Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

106.     During the Class Period, the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

107.     The Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. The Officer Defendants engaged in this misconduct to conceal GTAT's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

108.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GTAT securities. Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for GTAT securities had been artificially inflated by the Officer Defendants' fraudulent course of conduct.

109.     As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

110.     This claim was brought within the applicable statute of limitations.

111.     By reason of the foregoing, the Officer Defendants have violated Section 10(b) of

the Exchange Act and Rule 10b-5, and are liable to Plaintiff and the other members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiff as

class representative under Federal Rule of Civil Procedure 23 and Plaintiff's

counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other

members of the Class against the defendants for all damages sustained as a

result of the defendants' wrongdoing, in an amount to be proven at trial,

including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:  December 5, 2014                   Respectfully submitted,

                                           MALLORY & FRIEDMAN, PLLC


                                    By:  /s/ Mark L. Mallory
                                         Mark L. Mallory, NH Bar No. 1599
                                         Mallory & Friedman, PLLC
                                         3 North Spring Street Concord,
                                         NH 03301
                                         (603) 228-2277
                                         mark@mallloryandfriedman.com

H0040715.2

*Local Counsel for Plaintiff Norfolk County Retirement System*

Kimberly Donaldson Smith (to be admitted *pro hac vice*)
Christina Donato Saler (to be admitted *pro hac vice*)
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
(610) 642-8500
kds@chimicles.com
cdsaler@chimicles.com
*Counsel for Plaintiff Norfolk County Retirement System*
*and Proposed Lead Counsel for the Class*

H0040715.2